UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
WAYNE GARDINE,

                    Petitioner,      04 Civ. 1819(KMW)(DFE)


        - against –
                                     REPORT AND RECOMMENDATION
MICHAEL McGINNIS,                    TO JUDGE WOOD
                    Respondent.
-------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

        Wayne Gardine brings this *pro se habeas* petition
challenging his 1996 conviction for Murder in the Second Degree,
and Criminal Possession of a Weapon in the Second and Third
Degrees, after a jury trial in Supreme Court, New York County.
Justice Nicholas Figueroa sentenced Gardine to a prison term of
18 1/2 years to life for the murder, and lesser concurrent terms
on the weapon counts.

        Daniel Parker, Esq. represented Gardine during the trial and
sentencing.  On appeal, Gardine was represented by Michael
Taglieri of the Legal Aid Society, and he also submitted a *pro se*
supplemental brief.  The Appellate Division unanimously affirmed
the conviction.  *People v. Gardine*, 293 A.D.2d 287, 740 N.Y.S.2d
52 (1st Dept. 2002).  On May 23, 2002, Associate Judge Albert
Rosenblatt denied leave to appeal.  *People v. Gardine*, 98 N.Y.2d
651, 745 N.Y.S.2d 509 (Ct. App. 2002).

        On February 9, 2003, Gardine filed a *pro se* motion for a
writ of error *coram nobis.*  On April 4, 2003, the Appellate
Division denied Gardine's motion.  *People v. Gardine*, 308 A.D.2d
681, 766 N.Y.S.2d 415 (1st Dept. 2003).   On December 4, 2003,
Judge Rosenblatt denied leave to appeal.  *People v. Gardine*, 1
N.Y.3d 572, 775 N.Y.S.2d 789 (Ct. App. 2003).

        Meanwhile, on March 10, 2003, Gardine filed a *pro se* motion
to vacate the conviction pursuant to New York Criminal Procedure
Law § 440.10.  On May 16, 2003, the 440 motion was denied in an
opinion by Justice Richard Carruthers.  On November 18, 2003,
Justice Peter Tom denied leave to appeal.

        On March 8, 2004, Gardine filed a timely petition with our
Court.  On September 29, 2004, Assistant District Attorney
Meredith Boylan filed a 40-page Memorandum of Law and an Answer
annexing Exhibits A through P.  (I will cite to certain of those
exhibits as "Ex. __.")

1

On June 7, 2005, Gardine filed a 39-page Memorandum of Law and a 10-page Declaration.

A year later, on June 8, 2006, ADA Boylan submitted the transcripts.  Docket Item #20 is the transcript of the suppression hearings and jury selection.  Docket Item #19 is the transcript of the trial, and I will refer to pages of it as "Tr.__."

Gardine alleges several grounds for a new trial:

I.  He claims that the trial court violated his due process right to a fair trial and to present a complete defense by:  (a) refusing to give a missing witness instruction; (b) refusing to permit defense counsel to conduct a demonstration of distance by taking the jury out to the court hallway; (c) admitting evidence of Gardine's prior bad acts (selling marijuana); (d) admitting the eyewitness's identification of Gardine; and (e) giving an instruction that fleeing from detectives might be evidence of consciousness of guilt.

II.  He claims that his Sixth Amendment right to confront witnesses against him was violated when the main prosecution witness, Niki-a Santos, was permitted to invoke the Fifth Amendment, rather than answer certain questions during defense counsel's cross-examination.  This claim also alleges that the judge gave an improper instruction to the jury regarding Santos's invocation.

III.  He claims that the defense did not receive a report of a police-to-police radio communication; its description of the murder suspect was the same as in a signed statement provided to the defense, yet Gardine asserts a *Brady* violation.

IV.  He claims that he received ineffective assistance from his trial counsel.  He alleges, incorrectly, that trial counsel did not object to the prosecutor's summation.

For the reasons stated below, I recommend that Judge Wood deny Gardine's *habeas* petition.

Shortly before midnight on Friday, September 2, 1994, Robert "Dak" Mickens was shot and killed in front of 210 Edgecombe Avenue. That part of the avenue has a long stretch with no cross streets between 142nd and 145th Streets. The shooting took place somewhat south of 145th.

The jury heard from only one eyewitness, the victim's long-time friend, Niki-a Santos. He was 21 at the time of the June 1996 trial, and he testified as follows.

Santos often frequented the area along Edgecombe Avenue between 142nd and 145th Streets. (Tr. 46, 49-50, 68, 100-01.) During the three or four months prior to the shooting, Santos walked past Gardine every day, and observed him offering to sell marijuana from the stoop of a red building near the corner of 145th Street and Edgecombe Avenue. (Tr. 66-68.) Santos also interacted with Gardine, buying marijuana from him three or four times. During those transactions, Santos noticed that Gardine spoke with a Jamaican accent, but he did not learn Gardine's real name or nickname. (Tr. 66, 69-70.)

On the date of the shooting, Santos once again walked past the red building as Gardine sat on the stoop. It was early afternoon, and Santos noticed that Gardine was wearing a striped rugby shirt, blue jeans, and a cap. (Tr. 61, 74, 75.)

Several hours later, shortly before midnight, Santos was talking with friends in front of 180 Edgecombe Avenue, a bit north of 142nd Street. (Tr. 49.) He was approached by his thirteen-year-old friend Nicholas Veal. While they were talking, Veal said, "Here comes Dak," referring to their mutual friend Mickens. (Tr. 51.) Veal and Santos then walked north on the eastern sidewalk of Edgecombe. (Tr. 52.)

Mickens was walking south on the other side of Edgecombe. He called out to them and walked diagonally across Edgecombe. (Tr. 46, 52-53.) On the eastern sidewalk of the street, Gardine appeared from behind parked cars, said something like "blood clot," and pushed Mickens. (Tr. 56.) Mickens responded with an attempted punch, but Gardine pulled out a gun and shot Mickens 11 times. (Tr. 56-59, 62.) Before the shooter ran away, he and Mickens were in front of 210 Edgecombe; Santos and Veal were in front of 204 Edgecombe. Santos demonstrated this in court by indicating the distance between himself and the prosecutor; the judge stated that the distance was about 20 feet. (Tr. 54-55.)

It was almost midnight, but Santos said that the lighting on the street was sufficient for him to see Gardine clearly. (Tr. 61.) Santos recognized Gardine's face, and he noticed that the shooter's clothes were the same as those he had seen Gardine wearing earlier in the day. (Tr. 61-62, 71, 75.) Gardine finished the 11 shots, looked directly at Santos and Veal for a second, and then ran north on Edgecombe. (Tr. 65.)

Police Officer Kathleen Meehan testified as follows. She and her partner were in a nearby car, and they heard the shots being fired. They proceeded to 208 Edgecombe and saw Mickens's body on the sidewalk. Groups of people had formed around the scene, but Santos was the only person who came forward and said that he had witnessed the shooting. When Detective Carlton Berkley arrived at the scene, Officer Meehan directed him to Santos. (Tr. 200-09.)

Detective Berkley testified that he spoke with Santos and Veal for about 5 to 10 minutes at the scene and then had them transported to the precinct. After spending about 15 more minutes at the crime scene, Detective Berkley interviewed Veal from about 2:00 a.m. until 2:40 a.m., and interviewed Santos from 2:40 a.m. until around 3:30 a.m. (Tr. 297-99.) The record reveals nothing else about the interview with Veal. However, based on the interview with Santos, Detective Berkley wrote an official statement and Santos signed it. (Tr. 314-15.)

On cross-examination, Detective Berkley agreed that the official statement of Santos contained certain comments. For example, Santos said that, just before the shooting, he started to walk up Edgecombe (going north) and stopped "just past 180 Edgecombe at a brownstone." He then turned south toward 142nd Street and "immediately upon looking south, [he] heard someone say something in a Jamaican accent ... [and] then turned back towards 145th Street ... and saw the perpetrator shrug his shoulder into Dak." (Tr. 320.)

In the official statement, Santos did not specify that he was in front of 204 Edgecombe, and did not state the distance between himself and the shooter. (Tr. 321-22.) The defense stressed these omissions. A defense investigator testified that, in between 180 and 204 Edgecombe, there were seven buildings (each about 17 feet wide). He testified that the distance from "the northern edge of building number 180" to "the southern edge of 208" was about 198 feet. (Tr. 382.) (He also testified that it was only 41 feet from the northern edge of 204 to the middle of 210; Tr. 387.)

To give the jury a better idea of 198 feet, the investigator testified that the hallway outside the courtroom was only 157 feet from end to end. (Tr. 383-84.) Mr. Parker twice requested the judge to allow the jury to step out to the hallway to gain a better sense of the distance, but the judge denied his request both times. (Tr. 384, 390-91.) During his second denial, the judge said that the defense had sufficiently informed the jury that the hallway measured 157 feet (a measurement that was not disputed by the prosecutor).

Mr. Parker also stressed that the official statement signed by Santos said the shooter was about 6 feet tall and 150 to 160 pounds. Gardine was only between 5'7" or 5'8" and about 135 pounds; see Tr. 345. On cross-examination, Santos testified that he was 6'3" himself, and that he had gestured to Detective Berkley that the shooter's height appeared to come just below Santos's nose. Based on that gesture, Detective Berkley wrote "about 6 feet." Santos signed the statement but testified that he had not actually uttered a number. (Tr. 169.)

In addition to asking about these discrepancies, Mr. Parker asked Santos a series of questions about his involvement with drugs. Santos responded to questions about his prior guilty plea for possession of crack cocaine, at one point stating: "I was not guilty. I plead[ed] guilty to it [because] I'm not going to jail for four to five years for something I didn't do, so I took probation." (Tr. 106.) However, he admitted that he had "possessed crack" on other occasions. (Tr. 111.) Mr. Parker then asked him, "[W]here did you get the money to buy crack?" Santos refused to answer, stating: "I can't answer that ... I take the fifth, I take the fifth." Santos continued to "take the fifth" in response to questions about whether he sold crack or possessed crack while on probation. (Tr. 112.) On the other hand, he did admit to violating his probation by "steering" during a "crack sale." (Tr. 115.)

Later in the trial, the prosecutor elicited some rather unimpressive testimony about Gardine's behavior in avoiding the police. Less than 16 days after the shooting, Gardine was once again sitting on the stoop of the red building near 145th and Edgecombe. He was spotted by a team of three detectives who were looking for him. One of them, Det. Louis Torrellas, testified that he and the other two detectives got out of an unmarked car; each was wearing a jacket and slacks: "We started to approach him[;] I didn't get very close and he ran away." The detectives pursued Gardine, but lost sight of him. (Tr. 276-77.)

However, on October 5, 1994, Gardine made a court appearance in the Bronx, where he had a "pending case for disorderly conduct

and resisting arrest." (Tr. 285.) As he was leaving the courthouse, he was arrested by the homicide detectives. Later that day, Det. Torrellas brought a photograph of Gardine to the "Tombs," where Santos was incarcerated for violating his probation. (Tr. 286-87.) To "confirm we had the right guy at the station house" (Tr. 271), he showed Gardine's photograph to Santos, who identified it as a picture of the shooter (Tr. 84-85). On direct examination, he said that he also brought "photos of other people." However, on cross, he conceded that he remembered bringing only one photograph, that of Gardine.

On summation, Mr. Parker stressed that 20 feet was a much shorter distance than 198 feet. He also argued that Gardine's height and weight were less than the description given by Santos right after the shooting. Mr. Parker argued that Santos may have been mistaken in identifying Gardine as the murderer. (Tr. 424-25.)

In the prosecution summation, ADA Lanita Hobbs stated that "a person who was lying would have no reason to include" the details given by Santos. (Tr. 455.) She also told the jury that "there was absolutely nothing at all that was elicited from Mr. Santos which would suggest that he lied to you when he told you about the events," and that his "only motive in this case is to tell the truth." (Tr. 459.) On the other hand, for 10 pages of her summation, she responded to Mr. Parker's argument that Santos may have been honestly mistaken about the identification. She argued that the discrepancies were minor and that the evidence showed that Santos was accurate on several points. (Tr. 476-86.)

At Tr. 491-93, Mr. Parker made an objection in the form of a motion for a curative instruction. He pointed out that he had argued that Santos was mistaken but not lying. Ms. Hobbs replied that, regardless of what the defense summation argued, the burden of proof obligated her to show that the witness was not mistaken, and also not motivated to lie. (Tr. 492-93.) The judge denied Mr. Parker's motion. (Tr. 493.)

Mr. Parker also requested a missing witness charge regarding three persons: Veal, and two women known only as Margaret and Venus. (Tr. 416.) Ms. Hobbs replied that the People "have no idea where [Margaret and Venus] live." As to Veal, Ms. Hobbs recounted Detective Berkley's testimony (Tr. 308-10) regarding the efforts made to locate Veal, including phone calls, visits to his apartment, and an attempt to hand-deliver a subpoena; Veal's mother "refused to open the door and kept saying that she didn't want her son involved." Ms. Hobbs noted that Veal's age was 13 at the time of the shooting (and hence 15 at the time of the trial). The detectives slipped the subpoena under the door, yet

Veal did not come to court.  Hence, she argued that the witness was not within the prosecution's control for purposes of a missing witness charge.  The judge denied Mr. Parker's request for such a charge.  (Tr. 416-18.)

Regarding Santos's invocation of the Fifth Amendment, the judge gave the following instruction to the jury:

> When Niki-a Santos testified, he in [e]ffect claimed his Fifth Amendment privilege against self-incrimination.
> Now, witnesses have a constitutional right to refuse to answer particular questions that may tend to incriminate them, and I sustained Niki-a Santos'[s] right to claim the Fifth Amendment privilege.  I instruct you that no inference unfavorable or favorable to either party may be drawn by you from his refusal to answer those particular questions.
> However, since the questions do relate solely to his credibility as a witness, you may take into consideration his refusal to answer such questions in determining[,] as you may with all witnesses, to what extent you believe his testimony and how much weight you wish to give to his testimony in view of his refusal to answer those questions regarding his bad acts.

(Tr. 505.)

Regarding Detective Torrellas's testimony that Gardine ran from him two weeks after the shooting, the judge gave the following instruction:

> In this case it came out during the evidence that the defendant on September 18, 1994 ran when Detective Torrellas approached him.
> The defense contends that this was attributable to the fact that he had been associated with the sale of marijuana and that his flight at that time was in reaction to that type of activity.  Whether or not the evidence I had mentioned, his flight, does in fact evidence a guilty mind on the part of the defendant, and if so, what weight should be given to such evidence is exclusively a jury question.
> Under some limited circumstances, proof of such conduct may be considered by the jury.  I instruct you now under what circumstances you may consider such conduct.  Your first duty is to decide whether evidence of the defendant's conduct upon which the People rely,

if believed by you, does in fact evidence a
consciousness of guilt on the part of the defendant
relative to the shooting.  You must examine such
evidence carefully.  Such conduct may have an innocent
explanation.

If you find such an explanation from the nature of
the conduct itself, you must disregard such evidence
totally, forget that you heard it.  For example, common
experience teaches [that] even an innocent person who
finds himself placed under suspicion may instinctively
or protectively resort to conduct which might create
the appearance of guilt in order to avoid arrest or a
criminal prosecution.

Thus, if an innocent ... purpose may be drawn from
the evidence, you may disregard it completely.  Only if
you find that the conduct of the defendant was solely
motivated by consciousness of guilt relative to the
shooting, may you consider and weigh it in your
deliberations.

I instruct you that proof of conduct evidencing
consciousness of guilt has slight value.  Standing
alone, such evidence may never be made a basis for the
finding of guilt.  On the other hand, when the People
have introduced other direct and substantial evidence
pointing towards the guilt of the defendant, then
evidence of the defendant's running away may be
considered by you together with such other direct and
substantial evidence of guilt in arriving at your
verdict.

(Tr. 512-14.)

After further instruction and deliberation, the jury found
Gardine guilty of murder and of the weapons charges.  (Tr. 534.)

On appeal, the brief by Mr. Taglieri of Legal Aid (Ex. A)
presented two points:

POINT I: THE COURT VIOLATED APPELLANT'S DUE PROCESS
RIGHT TO A FAIR TRIAL WHEN IT REFUSED TO GRANT A
MISSING WITNESS CHARGE FOR THE SECOND EYEWITNESS
TO THE HOMICIDE ....   [Ex. A, pp. 15-29]

POINT II: THE COURT VIOLATED APPELLANT'S DUE PROCESS
RIGHTS TO A FAIR TRIAL AND TO PRESENT A COMPLETE DEFENSE
WHEN IT EFFECTIVELY PERMITTED A DEMONSTRATION [BY THE
PROSECUTOR IN THE COURTROOM] ... WHILE REFUSING TO
PERMIT A DEMONSTRATION [BY THE DEFENSE IN THE HALLWAY]
....   [Ex. A, pp. 29-36]

Gardine submitted a *pro se* supplemental brief (Ex. B) that made three additional points:

Point I: Gardine's due process rights were violated by the pre-trial ruling that the jury could hear Santos's identification of Gardine.   [Ex. B, pp. 10-16]

Point II: Gardine's due process rights were violated by the admission of evidence of prior bad acts (selling marijuana).   [Ex. B, pp. 16-19]

Point III: The judge's jury instructions were improper concerning Santos's invocation of the Fifth Amendment and concerning flight as evidence of consciousness of guilt.   [Ex. B, pp. 19-23]

The Appellate Division unanimously affirmed the judgment, stating:

The court properly refused to give a missing witness charge regarding a child who may have witnessed the murder.  Defendant failed to make a prima facie showing that the child was in the "control" of the People (see People v Gonzalez, 68 NY2d 424, 427-428).

The record established that the child, who was about 12 or 13 years old, refused to speak to the police [shortly after the shooting, the police interviewed Veal for 40 minutes (Tr. 298-99); the trial record does not show what he said, but there is no claim that the prosecution failed to reveal to Mr. Parker the content of what Veal said], that the child's mother informed the police that she would not permit her son to testify, and that efforts by the People to subpoena the child were fruitless.  Under these circumstances, it would not be natural to expect the People to call the child as a witness (see, People v Gonzalez, supra at 429; People v Garcia, 219 AD2d 541, lv denied 88 NY2d 847; People v Mancini, 207 AD2d 730).

Neither the prosecutor nor the court confused the distinct concepts of control and availability.  Under the particular circumstance, these concepts overlapped to a significant degree (see, People v Mancini, supra). The child and mother's refusal to cooperate, despite the People's efforts, not only went to the issue of control, but sufficiently established the child's unavailability (see, People v Rivera, 249 AD2d 141, lv denied 92 NY2d 904).  We note that the People's ability to force a child to testify over parental objection may

be more theoretical (see, Family Ct Act § 158; Matter of People v Louise D., 82 Misc 2d 68) than practical.

The court properly exercised its discretion in refusing to permit a totally useless demonstration requested by defendant. A defense investigator had already testified that a certain distance relevant to the case was approximately 200 feet. By way of illustration, the investigator added that the hallway outside the courtroom was 157 feet long. There was no reason to interrupt the trial to take the jury into the hallway to see how long it was, since they passed through the same hallway several times a day throughout the trial.

We have considered and rejected defendant's remaining claims, including those contained in his pro se supplemental brief.

(Ex. E, p. 63-65.) Leave to appeal was denied. (Ex. G.)

On February 9, 2003, Gardine filed a *pro se* motion in the Appellate Division (Ex. H) seeking *coram nobis.* Gardine argued that his "appellate counsel was incompetent for failing to argue that [his] trial counsel was incompetent." (Ex. H, p. 5.) Gardine was very vague about what trial counsel had done wrong. (Ex. H, pp. 5-9.) The Appellate Division denied the motion for *coram nobis*. (Ex. J.) Leave to appeal was denied. (Ex. K.)

Meanwhile, on March 10, 2003, Gardine filed a *pro se* 440 motion in Supreme Court, New York County (Ex. L). At ¶¶ 12-13, he noted that, two years after the trial, he requested documents under the Freedom of Information Law and, on October 16, 1998, the Police Department provided him with various documents, including one annexed to Ex. L, a computer-generated report of a police radio communication made at 12:35 A.M., 33 minutes after the shooting. Not surprisingly, it "lists the shooter's height and weight as 6 feet and 150 to 160 pounds, and the description is similar to the description given by Santos to Berkley as recorded on the DD-5 Report." (Ex. L, ¶13.) Gardine apparently forgot Detective Berkley's testimony that he arrived at the crime scene at 12:10 A.M. (Tr. 293) and spoke to Santos and Veal at the scene for "no more than five to ten minutes" (Tr. 297). Gardine's 440 motion focused only on the testimony that Det. Berkley interviewed Veal and Santos at the stationhouse from 2:00 A.M. to 3:30 A.M. (Tr. 298-99.) Hence his 440 motion, at ¶14, erroneously argued: "The description of the shooter on the withheld radio communication Report was either a statement by eye-witness Nikia Santos, made **much earlier** than his statements to Berkley, or it was a statement of another witness to the homicide." (Ex. L, ¶14, emphasis added.)

10

In a 3-page opinion (Ex. N), Justice Richard Carruthers explained as follows.  The 440 motion was referred to him because, by that time, Justice Figueroa was serving in the Civil Term.  The radio report was not *Brady* material:

> ... [Gardine] has made no showing that it contains exculpatory material ... [and] no showing that there was a reasonable possibility the failure to disclose the communications report to him materially contributed to the result of the trial.

Justice Carruthers also ruled that the radio report was not *Rosario* material, but that is solely an issue of state law. Gardine filed a motion with the Appellate Division seeking leave to appeal from the denial of his 440 motion.  (Ex. O.)  On November 18, 2003, Justice Peter Tom denied leave.  (Ex. P.)

The adjudications of Gardine's claims in his appeal, motion for writ of *coram nobis*, and 440 motion did not result in decisions that were contrary to clearly established federal law, nor did they involve unreasonable applications of federal law. Similarly, these decisions were not based on any unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## DISCUSSION

I:   <u>Gardine's claim that his due process right to a fair trial was violated by various decisions the trial judge made regarding admission of evidence and jury instructions.</u>

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  *Habeas* relief is therefore unavailable unless Gardine has established that the "error was so pervasive as to have denied him [the] fundamentally fair trial" that due process guarantees.  *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985).  In other words, the trial judge's decisions "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without [them].'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998), quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992).  Gardine takes issue with several of the rulings, but none of them denied him a fundamentally fair trial.

a. <u>The trial judge's refusal to grant a missing witness charge.</u>

Mr. Parker asked the judge to instruct the jurors that they could draw an inference adverse to the prosecution, because there was no testimony from three persons. Two of them were women whose addresses and last names were unknown. The third was Santos's friend Nicholas Veal, who (at age 13) was present at the shooting and was interviewed by the detective. "The decision whether to give a missing witness charge rests with the sound discretion of the trial court[,] [and] [i]ts decisions in this area will rarely support reversal or habeas relief." *Malik v. Kelly*, 1999 WL 390604, *7 (E.D.N.Y. 1999).

*Habeas* relief is "particularly inappropriate where, as here, defense counsel was allowed to urge an adverse inference in summation." *Id.* In the case at bar, Mr. Parker did urge an adverse inference; his summation said: "Other eyewitnesses would corroborate or contradict ... who did it [who did the shooting] or where people were or how dark it was. But they are not here because Mr. Santos didn't want them here." (Tr. 450.) Mr. Parker emphasized the two women as to whom Santos had supplied only first names to the police. Mr. Parker wisely did not emphasize Veal, because the jury had heard testimony that explained why the prosecutor had not put Veal on the stand.

For example, Det. Berkley testified:

> [Veal] left me with a phone number. I tried to call his phone and I got his mother a couple of times; but each time she refused to put him on the phone. Then when I responded to the location, she refused to open the door and kept saying that she didn't want her son involved.
> ....
> ... [At one point I located Veal] in the rental office [at his home] and he refused to speak to me ...
> ....
> ... [During my last effort] I went to his residence. I knocked on the door. I heard people inside. I knew someone looked out the peephol[e], but they wouldn't let me in. So I slipped a subpoena under his door.

(Tr. 309-10.) Veal did not comply with the subpoena. (Tr. 310.) As in *Malik*, "the trial court's decision not to give a missing witness charge was reached only after hearing evidence of ... unsuccessful attempts" to gain Veal's cooperation. *Malik v. Kelly*, 1999 WL 390604 at *7. Based on that evidence, the

trial judge found that Veal (aged 15 at the time of trial) was not within the prosecution's control. This finding is presumed to be correct unless rebutted by "clear and convincing evidence."  28 U.S.C. §2254(e)(1).

In challenging this finding, Gardine merely notes that "Veal had already cooperated in this case by making a statement to Detective Berkley" on the night of the shooting.  Gardine then makes the conclusory assertion that Veal "would surely be expected to give testimony for the People." (Petr.'s Memo. of Law, p. 20.)  Gardine has not demonstrated by "clear and convincing evidence" that it was "an unreasonable determination of the facts" to find that Veal was not in the People's control. 28 U.S.C. § 2254(d)(2).

Even if Gardine could show that Veal was in the People's control, Gardine must also show that the absence of a missing witness charge actually provided the basis for his conviction or removed a reasonable doubt that might otherwise have existed. *See Dunnigan v. Keane*, 137 F.3d 117 at 125.   Gardine claims: "Since Veal was concededly standing beside Santos during the incident, his testimony concerning the distance would have been determinative on th[e] question of measurement." (Petr.'s Memo. of Law, p. 19.)  However, the jury was well informed about the dispute concerning the distance between the shooter and the victim's two friends (Santos and Veal).  Thus, the jury was able to consider the probabilities that the distance was longer than the 20 feet estimated by Santos and, if so, how much longer.  A missing witness charge would not have affected this dispute to the point of creating a reasonable doubt.

In short, the refusal to give a missing witness charge was not error and it did not prejudice Gardine.

  b.  <u>The trial judge's refusal to permit defense
_____    counsel to take the jury into the hallway.</u>

As I mentioned earlier, the jury heard the defense investigator testify that the distance from "the northern edge of building number 180" to "the southern edge of 208" was approximately 198 feet.  (Tr. 382.)  To give the jury a better idea of 198 feet, he testified that the hallway outside the courtroom was only 157 feet from end to end.  (Tr. 383-84.)  The prosecutor did not dispute either of those measurements.  Mr. Parker twice requested the judge to allow the jury to step out to the hallway to gain a better sense of the distance, but the judge denied the request.  (Tr. 382, 384, 391.)  The Appellate Division ruled:

> ... There was no reason to interrupt the
> trial to take the jury into the hallway to see
> how long is was, since they passed through the
> same hallway several times a day throughout the
> trial."

(Ex. E, p. 64.)  Gardine has not disputed that the jury had
previously passed through the same hallway.  In any event, it
was not unreasonable for the Appellate Division to rule that
"[t]he court properly exercised its discretion in refusing to
permit a totally useless demonstration."  (Ex. E, p. 64.)  In a
similar habeas case, Judge Weinstein wrote:

> ... The store owner described to police
> one of his assailants  – – whom he later
> identified as petitioner - - as being shorter
> than him, roughly five-foot six-inches tall.
> The owner is about five-foot eight-inches tall.
> To demonstrate that petitioner - - who is
> apparently six-foot one-inch tall - - was the
> victim of a mistaken identification, defense
> counsel sought to have the store owner stand
> next to petitioner in court in order to
> demonstrate their relative heights ....

> ... Nonetheless, the value in the
> demonstration would have been primarily theatric,
> since the jury had before it not only evidence
> of the prior description but also relentless
> argument from defense counsel that, on the basis
> of the discrepancy, the identification must have
> been mistaken.

*King v. Hodges*, 2003 WL 22952832, *7-8 (E.D.N.Y. Nov. 10, 2003).

At Gardine's trial, the refusal to permit defense counsel
to take the jury into the hallway was not error and it did not
prejudice Gardine.

   c.   The admission of evidence of Gardine's prior
        bad acts (selling marijuana).

During a pre-trial hearing before Justice Allen Alpert,
Gardine was excused at his request and then Santos came into
court and testified as follows.  Prior to the shooting, Santos
frequently observed Gardine offering to sell marijuana, and
Santos personally bought marijuana from Gardine, face to face,
"six or seven times maybe."  (Docket Item #20, 4/25/96 Tr. 5-52,
esp. 9.)  The hearing judge ruled:

I find Mr. Niki-a Santos to be an entirely
        credible witness and I find that ... that it
        was impossible based upon Mr. Santos['s] prior
        familiarity with the defendant, for Mr. Santos
        to have been influenced by any police suggestion,
        assuming there was any such suggestion in the
        viewing of the photograph of the defendant.

(*Id.,* 4/25/96 Tr. 58-61, esp. 58.)

        Prior to jury selection, the prosecutor (*Id.,* 6/19/96 Tr.
8-11) made clear that she would be eliciting this same testimony
to assist the jury in assessing the reliability of Santos's
identification of Gardine.  Gardine's case has similarities with
*Dunnigan v. Keane*.  Dunnigan was convicted of robbing a wallet
that contained an ATM card.  The jury heard identification
testimony from the victim, and also saw ATM surveillance photos
of a man using the stolen ATM card.  The photos were apparently
less than clear.  Dunnigan's "wife testified that Dunnigan was
not the man in the ATM pictures."  137 F.3d at 122.  On
rebuttal, Eugene Baes testified that Dunnigan was the man in the
ATM pictures, and that he was familiar with Dunnigan's
appearance because he was Dunnigan's parole officer.  The Second
Circuit wrote:

        ... The purpose of introducing Baes's position
        was to show his familiarity with Dunnigan's
        appearance and voice, which was a necessary
        foundation for Baes's identification testimony.
        ...  In addition, it may well be material for
        the factfinder, in evaluating a witness's
        credibility, to know the relationship between
        the witness and the parties in order to assess
        whether the witness may have reasons for lacking
        objectivity. ... In all the circumstances, while
        it would have been possible for the most important
        foundation facts to be brought out without
        disclosing Dunnigan's parolee status, we think
        it was certainly permissible for the trial judge
        to conclude that Baes's position vis-a-vis
        Dunnigan was relevant.

137 F.3d at 126.

        In the case at bar, the prior bad acts were relatively
minor (small sales of marijuana).  This evidence worked somewhat
to Gardine's advantage; on summation Mr. Parker argued that
Gardine fled from the detectives simply because he did not want

to get caught in possession of a stash of marijuana.
Furthermore, Mr. Parker argued:

> You heard testimony that the defendant is a marijuana
> seller and [the stoop] is where he sells marijuana
> from.  The fact that the defendant ran[,] according to
> Detective Torrellas, does not indicate anything in
> connection with this case.  In fact, it indicates to
> the contrary.  Ask yourself, why would he hang out on
> a block and continue to sell marijuana there[,] a few
> doors up from where he supposedly murdered somebody?

(Tr. 447-48.)  Given these circumstances, the evidence about
marijuana sales is not a valid ground for *habeas* relief.

    d.   The admission of identification evidence.

    Gardine claims that Justice Alpert, after holding the
hearing, made an "unreasonable determination of the facts" and
an objectively "unreasonable application" of federal law in
denying the motion to suppress the evidence of Santos's
identification of Gardine.  (Petr.'s Memo. of Law, p. 24,
quoting from 28 U.S.C. § 2254(d).)

    In *Espinal v. Duncan,* 2000 WL 1774960, *3 (S.D.N.Y. Dec. 4,
2000), Espinal alleged that the in-court identification by
Santiago "had been tainted when the police initially showed him
a single photo that was unduly suggestive."  However, the trial
court found that Santiago had seen Espinal "at least 20 times in
the prior year."  Denying habeas, Judge Sweet wrote: "Santiago's
prior acquaintance with Espinal established that the in-court
identification was reliable notwithstanding the prior
photographic display."

    Before the Appellate Division, Gardine's *pro se*
supplemental brief erroneously asserted that, on the night of
the shooting, Santos did not tell "the Detective that he knew
the perpetrator prior to this incident."  (Ex. B, p. 11.)  But
Detective Berkley testified on redirect examination:

> Q:   Did Mr. Santos tell you during your initial
>       interview with him that although he didn't
>       know the name of the shooter, he was familiar
>       with the shooter?

> A:   Yes, he did.

(Tr. 354.)

Gardine also made an alternative argument to the Appellate Division:

> ... The real issue in this case i[s] not about whether the witness knew defendant prior to this incident or whether the witness bought Marijuana from defendant Occasionally. The Critical issue is whether the witness were able to observe the Shooter, and to make out an accurate identification ... without the Suggestive nature or tainted encounter or Contact with this girl named Nisie, who inform[ed] the witness that defendant did it, and who also provide[d] the witness with defendant['s] nickname [Ting-a-Ling].

(Ex. B, pp. 14-15.) But Nisie provided the nickname only after Santos had already given Det. Berkley the description of the shooter's appearance and accent, and the location of the stoop that the shooter frequented. (Tr. 56-67, 82-83; 303-04, 335, 360-64.)

In short, Gardine has utterly failed to show "clear and convincing evidence" to overcome the state court's findings of fact.

>    e. <u>The instruction to the jury regarding Gardine's</u>
>    <u>flight as possible evidence of consciousness of</u>
>    <u>guilt.</u>

Gardine claims that he "was denied his right to present a defense by the improper instruction concerning ... consciousness of guilt." (Petr.'s Memo. of Law, p. 21-22.) However, he offers no support for this argument and does not explain how the instruction had an effect on his defense.

Gardine would have to show that the instruction was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v. Keane*, 137 F.3d at 125 (internal quotation marks omitted.) On balance, the instruction was beneficial to Gardine's defense of mistaken identification. The judge began the instruction by reminding the jury of Mr. Parker's argument on summation, stating: "The defense contends that this [flight] was attributable to the fact that [Gardine] had been associated with the sale of marijuana and that his flight at that time was in reaction to that type of activity." (Tr. 512.)

17

Moreover, the judge emphasized that Gardine's flight may have been entirely unrelated to guilt, stating:

> Such conduct may have an **innocent** explanation. **If you find such an explanation from the nature of the conduct itself, you must disregard such evidence totally, forget that you heard it.** For example, common experience teaches [that] even an **innocent** person who finds himself placed under suspicion may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or a criminal prosecution. Thus, **if an innocent ... purpose may be drawn from the evidence, you may disregard it completely.** Only if you find that the conduct of the defendant was **solely** motivated by consciousness of guilt relative to the **shooting,** may you consider and weigh it in your deliberations.
>
> I instruct you that proof of conduct evidencing consciousness of guilt has **slight** value. Standing **alone,** such evidence may **never** be made a basis for the finding of guilt.

(Tr. 512-13, emphasis added.)

This instruction was not error, and did not prejudice Gardine.

> II: <u>Gardine's complaints about Santos's invocation of the Fifth Amendment and the corresponding jury charge.</u>

Gardine writes: "If the Constitutionally guaranteed right to confront witnesses against oneself is to mean anything[,] counsel for the accused must possess the ability to question prosecution witnesses as to immoral, vicious or criminal acts which bear upon their credibility." (Petr.'s Memo. of Law, pp. 21-22.)

Gardine also claims: "The trial court was in error" when it "instructed the jurors that no inference unfavorable or favorable to either party may be drawn by the jury from the witness['s] refusal to answer those particular questions [by invoking his Fifth Amendment privilege]." (Petr.'s Memo. of Law, p. 21.)

The Supreme Court has stated that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination." *Delaware v.*

*Arsdall*, 475 U.S. 673, 679 (1986).  Gardine could only demonstrate "a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination."  *Id.* at 680.  However, it would not be appropriate to force a witness to incriminate himself.  In fact, a trial judge has an obligation "to protect a witness" from "an attempted invasion of his constitutional protection from self incrimination."  *Alford v. United States*, 282 U.S. 687, 694 (1931).  Therefore, Gardine's right to confront witnesses was not violated when the judge sustained Santos's right to invoke the Fifth Amendment.

As to the judge's instruction on this matter, the only issue on *habeas* review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  However, the instruction itself was not "ailing."  The judge instructed the jury that Santos's invocation of the Fifth Amendment weighed on his credibility:

> [S]ince the questions do relate solely to his credibility as a witness, you may take into consideration his refusal to answer such questions in determining[,] as you may with all witnesses, to what extent you believe his testimony and how much weight you wish to give to his testimony in view of his refusal to answer those questions regarding his bad acts.

(Tr. 505.)  Far from violating Gardine's due process rights, this instruction was favorable to Gardine.  Thus, he cannot be granted *habeas* relief based on any aspect of Santos's Fifth Amendment privilege.

III:  <u>Gardine's *Brady* claim.</u>

Two years after the trial, the Police Department provided Gardine with a copy of the police radio communication report made 33 minutes after the shooting.  The description of the shooter's height, weight and clothing matches exactly the statements that Det. Berkley testified he received from Santos (orally a few minutes after the shooting, and in a signed statement about 3 hours later).  Hence it would have made no difference whether, at trial, Mr. Parker did or did not have this duplicative radio report.  It was entirely reasonable for Justice Carruthers to find that there was no *Brady* violation, and to deny the 440 motion.

IV:  Gardine's claim that he received ineffective
     assistance of counsel.

Gardine argues that his appellate counsel should have
claimed that his trial counsel was ineffective.  Gardine
says his trial counsel failed to object to portions of the
prosecutor's summation in which she implied "that [Mr.
Parker] was saying the witness is lying."  (Petr.'s Memo.
of Law, p. 38.)  However, Mr. Parker did object, in the
form of a request for a curative instruction to the jury,
in order to clarify that Gardine's defense was one of
mistaken identification, not a claim that Santos lied.
(Tr. 491-93.)

I find that Mr. Parker's performance was highly
competent, and so was Mr. Taglieri's brief on appeal.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I recommend that Judge Wood
deny Gardine's petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of
the Federal Rules of Civil Procedure, any party may object
to this recommendation within 10 business days after being
served with a copy (i.e., no later than **August 28, 2006**),
by mailing written objections to the Pro Se Clerk of the
U.S. District Court and mailing copies (a) to the opposing
party, (b) to the Honorable Kimba M. Wood, U.S.D.J., at
Room 1610, 500 Pearl Street, New York, NY 10007 and (c) to
me at Room 1360, 500 Pearl Street, New York, NY 10007.
Failure to file objections within 10 business days will
preclude appellate review.  *Thomas v. Arn*, 474 U.S. 140
(1985); *Small v. Secretary of Health and Human Services*,
892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).  Any request
for an extension of time must be addressed to the District
Judge.

DOUGLAS F. EATON
U.S. Magistrate Judge

Dated:    New York, New York
          August 9, 2006

20

Copies of this Report and Recommendation were mailed on
this date to:

Wayne Gardine,  96A5097
GreenHaven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Meredith Boylan, Esq.
Assistant District Attorney
One Hogan Place
New York, NY 10013

Hon. Kimba M. Wood